May it please the Court. My name is Sarah-Lene Durrett. I represent Appellant Brett Combs in this case. My brief raised six distinct issues. I'd like to focus on issues 1, 2, and 3 with the Court's permission. If the Court has specific questions about the other issues, I'm happy to answer those, but otherwise I'd like to stand on the brief as to those issues. The two pieces of relevant evidence in this case are both handguns. The first handgun is a black-and-silver Smith & Wesson .40 caliber handgun that was located underneath... When was the rifle? Is that wrong? I'm sorry? There's also a rifle, Your Honor. The rifle was found in the storage unit rented in the name of... Wasn't the conviction based on a handgun and the rifle? Two guns, Your Honor. That's correct. Then why is the other handgun relevant? I'm sorry? You just said two handguns are relevant. That's correct, Your Honor. All right. Well, go ahead. Okay. The first gun is the handgun found under the mattress inside the residence of Donna Hayborn. The second gun is the rifle that was found in the storage unit that was rented in the name of Donna Hayborn. Can I just jump into the first issue? Sure. Because they get this change of address form, which, as I understand it, the girlfriend testified she did, in fact, submit it to parole authorities? Well, Your Honor, there was testimony from the girlfriend that she created a typed change of address form and that she walked it into the parole office. However, the officers in the case testified that they received a fax change of address form, that they could not tell who the change of address form came from. They couldn't confirm it was from Mr. Combs. Okay. But, I mean, is there some question about the authenticity of whatever the officers received? I mean, the fact that they got it by fax just suggests that whoever the girlfriend handed it to wasn't the person, you know, wasn't the ultimate recipient. They just had to get it by fax. Is there something else that calls into question the authenticity of the fax that came in? There is, Your Honor. The fact of the matter is the fax was not produced in discovery. It was not admitted at trial. Mr. Combs was not able to challenge anything contained in the fax. We don't know if there was a signature on the fax. We don't know. What we do know is both Donna Hayborn What difference does it make? She testified that, A, he was living there, and, B, she had communicated to the probation officer that he was living there. And then the probation officer communicated to the probation office that he had changed his address, which turns out to be true. So what's the problem? Well, Your Honor, it's actually, I think it moves too far ahead in the case to say that it turns out to be true. There are a couple of issues there. The first issue you said was she notified parole and probation that he was living there. We actually don't know that to be the case. She did testify regarding her completing a change of address form. The second thing you said was that she told the officers that Mr. Combs was living there. It's clear from the fax of the case that she didn't tell officers that until they were already conducting a search of the house. And that's where we run into the problem here. As you previously discussed in the case before ours, nothing in the law justifies the entry of law enforcement officers into a third-party home to search for a parolee. I agree. That's why it all turns on this fax that they get. But what calls into question the, I mean, and I assume that these officers who received the fax testified at the suppression hearing, that the district court was able to assess their credibility and found them to be credible? No, Your Honor, they didn't. So what happened was Mr. Combs' supervising parole officer testified at trial. She did not actually receive the fax. She testified that another officer had received the fax. On the morning she received the call from the Las Vegas Metropolitan Police Department. When the police department initially called, she gave them Mr. Combs' old address, which was an address on Sparkling Vine Road. That was the same address that was listed in the scope that the officers had run prior to their call. Moments after this phone call, she received word that there's a fax that has a change of address for Mr. Combs. So she then calls back the officers, and they continue their surveillance at the new residence. She does nothing to verify the change of address. She does not go to the old address. She does not call the old address. Are you saying that this is what doesn't make sense to me? If we didn't have the girlfriend's testimony, I would credit your argument. But are you saying that the officers just made up this fact that they never really got any change of address for them, and they just decided after the fact to try to justify their otherwise illegal search by making up this receipt of a change of address? Well, Your Honor, it's not that I'm saying they made it up. The fact of the matter is it's the government's burden to prove that the search in this case was legal. No fax was produced. The only officer from parole and probation who actually participated in the search in this case, who testified at trial, said that he would never have relied on a fax as a valid change of address form. He said he didn't receive that information. He was told from his supervising officer, who did not testify, that there had been a change of address. So that's what that officer said he was relying on. So I do think there is an issue with the fax, and I understand the issues that you have raised. But the fact of the matter is there was no evidence to show that the fax actually existed. And when officers were questioned regarding the fax at trial, they stated that the parole file that would have contained the fax had been destroyed already. So there was no way for Mr. Combs to look at the fax to determine where it had originated or what it was. Basically, it should be treated as an anonymous tip in this case. How long after? Is it unusual to destroy a parole file, A, ever, or B, while the case is still pending? Your Honor, not in my experience is it usual. But, of course, I'm not a witness in this case, and I can't testify. But the officers did testify at both the suppression hearing and at trial that the file had been destroyed, and that then not only were the terms and conditions of Mr. Combs' parole included in that file, but the fax also would have been presumably inside the file. If you can move on. I'm particularly interested in hearing about the evidence regarding the rifle. Okay, Your Honor. At the trial, the government ---- Which would not be pertinent to the conviction. Is that correct? In other words, if we thought there was sufficient evidence with regard to the handgun, but not with regard to the rifle, the conviction would still stand? Well, Your Honor, that's not actually the case. Because if there's an issue with the rifle, the third issue that I'd like to speak about today also is relevant here, because it goes to the credibility of the identification of Mr. Combs in relation to that first handgun. So I do think ---- You're saying that both of them may have separate problems. That's correct, Your Honor. But if we didn't think that, but we thought that the rifle was not, there wasn't sufficient evidence as to the rifle, it wouldn't affect the conviction, but it would affect the sentencing. Is that correct? That's correct, Your Honor. Well, I'm not sure that that's actually true, Your Honor. It's the third issue that would affect the sentencing. It's the ---- Well, I think what I'm confused, because there's a special verdict form. The jury found beyond a reasonable doubt two guns. Only one is sufficient for the conviction. That's correct, Your Honor. So if you take out the rifle, why wouldn't the conviction still stand? That's correct, Your Honor. And that's, again, why I raised the issue of the third issue, which is the in-court identification tying Mr. Combs to the first handgun. Oh. So I think if in conjunction, Issue 2, which is the fingerprint evidence on the rifle, and Issue 3. But just to get the lay of the land straight, if we thought there was not sufficient evidence beyond a reasonable doubt with regard to the rifle, it would matter to the sentence whether the rifle, whether there were two guns or one? And, therefore, there would have to be a finding by the judge, a separate finding by the judge with regard to the rifle, which there hasn't been? No, Your Honor. I don't believe that there was a sentencing issue directly connected. That wouldn't matter. It would not matter as far as sentencing. I thought the base offense level was set by the rifle, not the handgun, and that it would be different if you only had the handgun as the basis for the conviction. Is that wrong? Your Honor, I'm actually not sure on that. I'll have to check the record and then, hopefully in my time for rebuttal, I can bring that back up as far as the base offense level. But I will address your question regarding the fingerprint evidence in this case. The government produced a crime lab analyst to testify regarding the latent print that they found on the rifle. I didn't ask about the fingerprint evidence. What I want to know is, assuming his fingerprint was on the gun, was there sufficient evidence? Assuming they can show that his fingerprint was on the gun? Well, certainly, Your Honor, this court and other courts have adopted the ACE-B method as a reliable method for fingerprint analysis. And so if the district court … But if his … my understanding of the record is this. He … the gun … the rifle … the girlfriend testified, or at least by implication, that the rifle was not his rifle. It didn't belong to him. It was her rifle. That's correct. It was in a storage place as to which she was the official owner or renter, although his name was on the paper. She had a key. He didn't have a key. And he … but he picked up the rifle. She claims he picked up the rifle once. Is that sufficient for conviction? Let's say it's true and the fingerprint proves it. Your Honor, I do think that would be sufficient in this case because it is a felony possession case. So the question is … Why is there possession when, if I understand what happened, was she shows him the rifle, he touches it, she then puts it back and she locks it up. It had its own little case, which she only had the key to. So all he's done is he's touched it. Why do you think that's sufficient? Well, Your Honor, I don't think that the statute, the felony possession statute, says anything about continuing possession of the gun. And I don't want to argue against my own case in this situation, but I do think … Do you mean if I go to somebody's house and he shows me their gun and I touch the gun, I possessed it? Well, Your Honor, that was certainly the government's argument. Well, I understand that, but it surprises me. I do think there would be an issue, Your Honor … If somebody shows me their gold necklace and I finger it and say, this is a very nice gold necklace, I possessed it? Well, Your Honor, I do think there's an issue with continuing possession. Obviously, Mr. Combs did not have dominion and control over the gun, and that was certainly … Even when he touched it? Certainly, Your Honor. Even when he touched it, he did not have the ability to take the gun and use it in another situation. But at trial there was testimony that he did touch it, and I think that the statute does allow for possession under those circumstances. I concede that the court maybe disagrees with me, and I don't want to argue against my own case, but I think it's clear that Mr. Combs did not have continuing possession of the gun. It was moved outside the house. It was in the locked storage unit, which Donna Hayward had the only key to, and it was inside the lockbox in that storage unit. So for that reason, I do think there is an issue with the actual possession of the firearm. All right. So you want to talk about the handgun? I'm sorry? You also want to talk about the handgun. And the handgun, again, Your Honor, is having to do with … That's the third issue here, which is the court produced, or the government produced a witness from a robbery in Colorado. She had previously been a victim of a robbery there. They produced her testimony in an effort to tie Mr. Combs to that silver and black handgun that was found under the mattress in Donna Hayward's home. She testified that Mr. Combs was the person who robbed her there and that the silver and black handgun looked like the gun that was used in that robbery. However, as noted in the record and as seen in the exhibits that I produced to the court, the line-up that was used to identify Mr. Combs was impermissibly suggestive in this case. I don't know if you had a chance to look at those exhibits. Mr. Combs' picture is at Exhibit 20F. Let's assume that's true. Then what? Well, Your Honor, in this case, if the line-up was impermissibly suggestive, then it's possible that that rendered her in-court identification unreliable. When you look at the... But did it? Yes, Your Honor, it did. Did she say she was 100 percent sure? She did, Your Honor, but that was after she had previously identified two other people. But we allow that to happen, don't we? We do, Your Honor, but the problem here is the connection between the line-up and her testimony in court later. She initially identified two other people. Well, she didn't. She said they kind of looked like them, but it's not him. I thought that's what she said. She said something like that, Your Honor. And then two months later, the police produced this line-up with Mr. Combs in full vibrant color and the other muted pictures, and they allow her then to look at them. She identifies Mr. Combs. All right. What I'm asking you is, I mean, I will tell you that I looked at these pictures this morning. I had no idea which one was him, and I said, that must be him because it's the only one you can actually see. So there's certainly a difference between the photos. But so what? I mean, in terms of when she gets up in court and says she's 100 percent sure. Well, Your Honor, the problem is the connection between the two. So she's had this opportunity to view this line-up, to now get some suggestion from the police officers as to which one is Mr. Combs. So she comes into court. She then points at Mr. Combs and says, he's the one that robbed me. What is the legal standard about that? I mean, if you have a suggestive photo array, that does not negate the identification, right? Right. The question is then does it render the in-court identification unreliable in some way? Right. And she said she was 100 percent sure. And the district court thought it didn't render it unreliable. So what are we supposed to do about that? Well, Your Honor, I think in this case, it's clear that this court does have the ability to review that determination, even though the district court found that she was credible or reliable on that particular issue because we have to start by looking at the unreliable, underlying, impermissibly suggestive line-up. And that's the question that this court can review de novo and determine, yes, it was impermissibly suggestive. And Your Honor has just stated that it's very clear from looking at the pictures which picture is Mr. Combs. Now, which picture is much more obvious than the others? Well, let's say that we agree that the in-court ID, even the in-court ID should not have been allowed. What follows from that? Well, then, Your Honor, I think we go back to the suppression of that silver and black handgun, which is the gun that was found underneath the bed in the home of Mr. Combs. Why would the gun be suppressed? Because the only reason that her testimony was admitted, Your Honor, was to tie Mr. Combs to that silver and black handgun. So she's the person who tied him to the gun. It was found under his mattress, and his girlfriend said it was his gun. No, Your Honor. His girlfriend stated initially that his gun was a black handgun that was found. And I can tell you in the record where she says that, Your Honor. That the one under the mattress was his gun? She later did. And she did the same thing, Your Honor. She appeared in court. The police produced a photograph and said, Is this the gun? And she said, Yeah, that's the gun. But the problem was initially she stated it was a black handgun. So we have a problem. But she also said that he came there with one gun and he walked around with it all the time, and his mother said the same thing. So there was a handgun that was his gun in the house. It's certainly logical it would be the one under his mattress. Your Honor, I understand that we can make those logistical mistakes. I thought you were going to say something else, which is that all this evidence about the robbery came in on the premise that she had seen him. Well, that's certainly true, Your Honor. And that was the fourth issue that we raised. There was lots of prejudicial evidence that came into evidence in front of the jury. All of those things together, cumulatively, were very prejudicial to Mr. Combs. All the evidence regarding the robbery, stolen property, drugs in Donna Hayborn's purse, all of this information came in to weigh against Mr. Combs in connection with those things. And I think for that reason – Well, the drugs in Donna Hayborn's purse probably helped him, i.e., made her less credible. Well, that's possible, Your Honor, but it's clear that she admitted on the stand that she was seeking leniency in her state court cases as a result of her testimony, and so she had clear incentive to lie about Mr. Combs or to write stories about him. It all helped. All that helped. Anyway, thank you very much. We'll give you a minute. Thank you, Your Honor. Good morning. May it please the Court. Christina Silva on behalf of the Appeal League of the United States. I'd like to begin with, with Court's permission, discussing the last issue that would be the robbery evidence that came in in the identification. There was discussion that that was overly prejudicial evidence. I believe that that evidence was not only proof of possession of that black and silver handgun but also 404B evidence. And so I believe it was showing continuing possession. That robbery occurred a mere six weeks prior to the incident for which Mr. Combs was arrested for and tried for another six. I understood her. I mean, she says that in her briefs, but her argument, main argument at this point is that this woman should not have been able to testify that he was the person who came in at all, so she should have just gotten off the stand at that point and not been able to say anything about any robberies or anything else because she had a impermissibly inaccurate identification. Well, Your Honor, I believe that that evidence was well within the discretion of the Court to let in. Not only that, it was right for attack on cross-examination. The defense had every opportunity to attack that cross-examination, to attack the identification not only of the photo lineup but also her in-court identification, and she was solid on both of those. Were the color photos introduced as exhibits at the trial? I believe they were introduced, Your Honor. Did the district court make a finding as to whether the array, photo array, was impermissibly suggestive? I believe he found that it was not impermissibly suggestive. Does that matter if we thought otherwise with regard to his later determination as to whether, as to her in-court ID? Your Honor, it would only matter if that evidentiary ruling would have substantially affected or more than likely affected the outcome of the verdict, and it would be our position that it would not have affected the outcome of the verdict. What would it not have? Her identification? Her identification, right. Her identification of the gun was additional evidence that he had the gun that also was proved by him being in the home and the weapon. But it also brought all this robbery evidence in, which might have been permissible if the evidence connecting him to the gun was permissible, but otherwise would have been unduly prejudicial and not permitted under 404B, right? That's possible, but like I said, I have a two-pronged approach to that. It was 404B evidence, but it was also evidence of possession, since possession is a continuing offense. He had that possession of that firearm from at least November. But not if she had an improper – if her identification of him as the person who was there with the gun doing the robbery shouldn't have been admitted in at all, then none of that – then there was no basis for any of it to come in. It's possible, but nonetheless, it wouldn't – I argue it would be that it wouldn't have affected the verdict. You don't think all the robbery evidence, if it wasn't attached to anything permissible, would have been impermissible and probably not harmless? I would say it was harmless, considering the quantum of evidence against Mr. Combs for these two guns. What was the quantum of evidence with regard to the rifle? With regard to the rifle? Well, the rifle itself was located, as the Court has discussed, in a storage unit that he had access to. Yes, the testimony was that she had the key. She had the key, and he was not the owner on the form. Correct. But he was living with her where the keys were located, so arguably he had access to that storage unit. But there's no evidence that he had access to that key or that gun. I apologize, Your Honor. Was there evidence that he had access to that key and could have gotten into the storage? Constructive possession and constructive access, yes, Your Honor. He was living there. He had his stuff there, including the stuff from the robbery in Colorado, the stolen property, the jewelry, the smoke shop items. What was the Court's instruction on the elements of possession? How did the Court define possession? Possession was defined as either constructive or actual possession. I don't have that jury instruction in front of me, though it was laid out in detail in the jury instruction regarding how one could possess a firearm, either actually or not. Did the Court indicate to the jury that the defined possession, that they had to find the power and intent to exercise control? Yes, Your Honor. That is part of the standard jury instruction. So what was the basis for their inferring with respect to the rifle that the defendant had the power and intent to exercise control? Well, I would start from the moment that he actually possessed the gun. He had the power and the control to say, I'm not going to touch that gun, but he did anyway. Ultimately, that gun was then subsequently moved to a storage unit, which he had access to pursuant to the agreement of the storage unit that he could have gotten into that unit. That's not my understanding. My understanding, according to the storage unit, is that in order for a person who was not the renter to go in, they had to have a key, and he didn't have one. And I would respectfully disagree as to whether or not he did not actually have the key, but he had access to the key to get into that unit. I'd like to know what the evidence in the record is that he had access to that key. Other than that he was living at that location. He said, I have the key. Right. Where she was living, where she had the key, he was also living there, and therefore had access to that key to get into that unit. Wasn't the rifle also in a separate compartment so that he would have had to have access to two keys? Correct. And there was no evidence of direct access, no direct evidence of access to either key, right? Correct. Can I ask the same question I asked your opponent? Let's say that the court concluded there was insufficient evidence to support the conviction with respect to the rifle. Was the rifle the predicate for the base offense level that was used at sentencing? I believe it had no effect on the base offense level. It would still have been a .20. I thought the .20, though, was predicated on a gun that could fire or had a capacity to hold a certain number of rounds, which wouldn't have applied to the handgun. Am I wrong on that? A .20 would apply for any person who has a prior conviction for a crime of violence, which Mr. Combs did. It would be that coupled with the firearm. If there was an enhancement for extended capacity, it would have raised that by two levels. That would have an impact on that if it had the capacity to hold a higher magazine as opposed to just a rifle that contained a regular magazine. So the bottom line is it could have had an effect on the sentence? It may have had an effect on the sentence if that's what the court determined. Okay. Are you going to address the initial search question? Yes. Yes, Your Honor. I would like to note that according to the testimony of Ms. Hayworn, the change of address form that was submitted was not only typed by her and delivered by her to the probation office, but it was also signed by Mr. Combs. Ultimately, the probation officer testified that she received a faxed copy of that address. No. I thought she didn't. I thought the only person who testified was the person who said that he spoke to somebody who received the fax. No, Your Honor. The actual testimony was from Officer Lindquist, who testified that she received a copy of the fax from Mr. Combs' prior supervising officer the morning in question, that he handed her the copy of the fax, which is at what time she called the officers back and said, actually has the new address of 9421 Shellfish Court. I think that's important because at the time, as per the testimony that came out in the motion to suppress, at the time that Ms. Lindquist received that fax, she had just been assigned as Mr. Combs' supervising officer and had not met with him. So it makes sense that that fax would have gone to his previous supervising officer, who would have provided that to her as his new officer, so then she could have gone and initiated the home contact with him, pursuant to the conditions of his parole. I'm sorry. I wanted to go back, and forgive my slowness, to the question of whether if the conviction on the handgun was correct and the conviction on the rifle was incorrect, whether it had any effect on sentencing. The offense level was 20. That was based on the two guns. But even if it had only been one gun, wouldn't it still have been 20 because of his prior felony conviction? Correct, Your Honor. So if the probation officer had taken account of facts that are not in dispute, namely his prior felony conviction, and had correctly calculated the sentence, it still would have been 20. Therefore, it's at most harmless error, yes? Yes, Your Honor. And you're saying it could have affected an enhancement, which would have to be straightened out. If the enhancement was applied to the rifle, then that would be a separate issue. Well, was there or wasn't there? Your Honor, if I may look at that. I don't believe there was. I didn't think there was. I don't believe there was, Your Honor. I thought it would have affected the base offense level, but it didn't. It would have affected the base offense level. It would have made it a 22 as opposed to a 20. So I do not believe there was an enhancement for that rifle. But there was none, and so even if it could have been 22, the judge thought it was 20, and therefore if we get to 20 through a different route, there was no harmful error. Correct, Your Honor. Can I go back to the search? Yes. So was the change of address form that the girlfriend gave to the parole officer, was that produced, at least? That was not produced at the motion to suppress or at the trial because as Mr. Rett correctly pointed out, the probation file had been destroyed by the time that this case was brought before motions and before trial. Oh, the entire file. The file had been destroyed. Correct. So at that point, the best evidence was the testimony of the officer who testified that she had received it, and then subsequently the testimony of Ms. Hayborn, who verified that, in fact, a form was filled out and submitted to verify his change of address. Moreover, the testimony of the officer was that the only way parolees and probationers reported the change of address was self-reporting. There wasn't a form they had to fill out or anything else. That was the way they did it, and then subsequently officers went out and did a home contact. If you have no further questions, I will yield my time. I'd just like to go back briefly to the identification. Yes. Your ultimate argument is that the whole identification doesn't matter because that whole witness doesn't matter for homelessness purposes, but that seems — but if we didn't think that, if we thought the array suggestive, but she did testify quite firmly, does it matter to our deference to the trial judge's conclusion that there was adequate certainty or that the identification should be admitted that he didn't think the array was impermissibly suggestive? As I assure you, you would have to find that the judicial court committed clear error in making that determination, and I don't believe given the array that was submitted as well as her testimony, which I will testify or I will let you know that during her testimony, when presented with a firearm, she was presented with a firearm. I presented it to her, so it was face up in my hand like this, and she told me, that's not the side of the gun I saw. So I had to turn the gun, which was as if someone was holding it on their side, and she pointed out in front of me, in front of the jury, that that was the gun, that's the side of the gun I saw, and I know because it has scratches on it. She was very clear on what the firearm that she was able to identify. Her testimony, which is why the judge in sentencing made a point of saying her testimony was very credible. Ultimately, I believe that while the photo array was not perfect, they often are not perfect given the nature of photo lineups, but again, it was right. They had every opportunity to cross-examine her on that issue. I will note that in her initial description of the robber, she said he had brown eyes, and in that photo lineup, Mr. Combs had blue eyes. I believe that's something that could have been attacked at the trial, but was not. Rather, it was just the photo lineup itself. Can I ask, am I right in remembering that some of the stolen loot from the victim's shop was found in Mr. Combs' home? That's correct. What was it, and where was it found? The testimony, the victim from the robbery worked at a jewelry store called Swirl Sky. It was actually very unique bracelets created by former Senator Ben Nighthorse. Those bracelets were located in the same master bedroom where the handgun was located. The property was kind of scattered all over the place in that master bedroom, between the bedroom itself and in the closet. Not only was there jewelry, but then there was also the smoke shop supplies that were located from another robbery that took place also in Durango, Colorado. And the victim of the robbery, I guess for this jewelry, at trial identified the items, the stuff that got stolen from me? Correct. Okay. Correct. Do you have anything else? Nothing further. I'll yield my time. Thank you very much. Thank you very much. I'll give you a minute to wrap up. I'd just like to respond to a few things. I know that Judge Watford asked whether the color photographs were admitted at trial. They actually were admitted at trial, but prior to trial there had been a motions hearing in which Mr. Combs' attorney had submitted the evidence for review challenging the photo lineup, and those were submitted in black and white as they came through on the docket. So at the time that the district court made its decision regarding the suggestibility of the lineup, he did not have the color photographs in front of him. He only had the black and white? That's correct. That's because? That's because through the court filing system, the attorney for Mr. Combs submitted them through the court filing system, and they came in black and white. Did the court ever revisit that ruling after seeing the color photos? No, Your Honor, he did not. And there was a standing objection by defense counsel as to this issue when Ms. Huffman testified. And I will just note, for the record, I know that the government's counsel stated that in the photo lineup Mr. Combs had blue eyes, and that's actually not true. He definitely has brown eyes. One other person has blue eyes in the lineup, and the other four are Hispanic men. So there's clearly a distinction between the photos, not only because of the color, but on that particular issue as well. I will note Your Honor's asked briefly about the facts, again, the fact submission that came into the parole and probation officer. There was a parole officer who testified that he would not have accepted this type of change of address as an official change of address form. So it was clear that he would not have personally relied on that as a change of address, and he would have done more investigation. This was the officer who testified. He was told there was a change of address by a supervisor, and then he was also told when he got to the house that Metro officers had seen Mr. Combs at the house, which ended up not to be the case. When Metro officers were questioned, they said that was not the case. So certainly it's clear that I don't think there was sufficient evidence for the officers to rely on that fax in entering the home prior to the search. Did you have a chance to check the sentencing guide? I did, Your Honor. Are you in agreement that the error would be harmless as to the calculation of the offense level? Your Honor, based on the record, it's hard to tell because the court just says that the base level offense is 20, so it's hard to know what that base level offense is predicated on. I'll accept the government's representation that it was based on Mr. Combs' previous felony conviction, and then there was only a four-level enhancement based on the testimony of Julie Huffman, which is the enhancement that we challenged on appeal. Okay. Thank you both very much for that very helpful argument. The case of the United States v. Combs is submitted. The next case in the calendar, I.T.T. Court v. West, has been submitted on the briefs, and we are going to recess until tomorrow. Thank you very much. All rise. It's now time to recess.
judges: Rakoff, Berzon, Watford